WUERSCH & GERING, LLP
100 Wall Street, 21st Floor
New York, New York 10005
(212) 509-5050
Stephen B. McNally, Esq.
Francesco D. Di Pietro, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____x
In re:                                  :
                                        :
IRON MINING GROUP, INC.,                :        Chapter 11
                                        :        Case No. 11-14032 (SCC)
                    Debtor.             :
_____x


**AFFIDAVIT IN LIEU OF DIRECT TESTIMONY OF GARRETT K. KRAUSE**
**IN OPPOSITION TO MOTION OF MST FINANCIAL, LLC SEEKING**
**(i) APPOINTMENT OF CHAPTER 11 TRUSTEE; (ii) CONVERSION OF**
**CASET TO CHAPTER 7, OR (iii) RELIEF FROM AUTOMATIC STAY**


STATE OF NEW YORK        )
                         )      ss:
COUNTY OF NEW YORK       )


        Garrett K. Krause, being duly sworn, deposes and says:

        1.      I am the Chief Executive Officer of Iron Mining Group, Inc., the above-captioned

debtor and debtor-in-possession  (the "Debtor" or "IMG").

        2.      On August 24, 2011 (the "Filing Date"), IMG filed a petition for relief under

Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  Since the Filing

Date, IMG has operated its business and managed its property as debtor-in-possession.

        3.      IMG is a development stage iron ore mining company which acquires and

develops iron ore mining properties in Chile and Mexico, principally through its subsidiaries CIM Mineral Investors, S.A. ("IMG Chile"), Hierro IMG Mexico, SA de CV ("IMG Mexico") and IMG Iron Ore Trading S.A. ("IMG Trading"). These investments can be in the form of acquiring mines, acquiring deeded or contractual rights to extract minerals, or contracting for supply or delivery requirements, such as options and put agreements.

4.     IMG was organized on September 17, 2007 in the State of Florida under the name Catalyst Ventures Incorporated. The company filed an amendment with the Florida Secretary of State changing the company's name to WorldVest, Inc. on July 2, 2009, and on October 15, 2010, changed its name again to Iron Mining Group, Inc. IMG is publicly traded on the over-the-counter bulletin board of the NASDAQ stock exchange under the symbol IRNNQ. As of the Filing Date, IMG was current on all of its filings with the Securities and Exchange Commission. IMG filed its most recent Form 10Q Quarterly Report for the period through June 30, 2011 just prior to the Filing Date. A copy of this 10Q Quarterly Report for the Period through June 30, 2011 is attached hereto as Exhibit "A."

A.     **Background of Relationship Between IMG and Sunrise Securities Corp., Globe Specialty Metals, Inc., Marco International Corporation, Alan Kestenbaum, Nathan Low and MST Financial, Inc.**

5.     In mid-2010, IMG sought financing to permit it to acquire and develop mining properties and reserves, particularly funding certain identified projects in Mexico and Chile. IMG engaged Sunrise Securities Corp. ("Sunrise") as its investment banker to assist it in securing financing to enable the development of these opportunities.

6.     IMG and Sunrise entered into an engagement agreement on July 26, 2010 (the "Engagement Agreement"), whereby Sunrise would act as exclusive financial advisor to IMG

and sole lead placement agent in connection with a best efforts private placement of up to $50,000,000 or more of IMG's equity securities. IMG engaged Sunrise because Mr. Nathan A. Low, the principal of Sunrise, boasted that Sunrise had substantial experience in obtaining financing in the metals and mining industry, including having completed a supposed $150,000,000 financing for a company called Sable Mining. I later learned that, contrary to Mr. Low's representations, Sunrise did not underwrite the Sable Mining financing.

7.      I personally, on behalf of IMG, spent at least three months working with Sunrise to construct a Private Placement Memorandum and offering materials, a copy of which is attached hereto as Exhibit "B." In this process, and at IMG's expense, IMG made a significant amount of due diligence information available to Sunrise and the prospective investors introduced by Sunrise for review. This information related explicitly to the iron ore mining opportunities IMG sought to pursue in Mexico and Chile, and it largely details the business plan that IMG in fact implemented in 2010 and 2011.

8.      Starting in November 2010, Sunrise began to market the offering to its network of investors and conducted an institutional road show. IMG was offered several financing opportunities and one investment syndication firm in fact secured commitments from its managed wealth clients to invest a total of approximately $2,000,000 into an IMG private placement.

9.      IMG did not pursue the private placement and preliminary commitments after being counseled to forego that opportunity by Sunrise and Mr. Low. Mr. Low instead steered me to Globe Specialty Metals, Inc. ("Globe") and its chairman Alan Kestenbaum in late November 2010, and explained to me that Mr. Kestenbaum was very interested in participating in a

3

financing with IMG to be syndicated exclusively by Sunrise and that Mr. Kestenbaum would be a fantastic partner. Further, Mr. Low told me that IMG should pursue a relationship with Globe and forego the options under the Private Placement Memorandum that we had tendered and that Globe was the strongest possible partner.

10.     By making these assertions, Mr. Low induced IMG to abandon the Private Placement Memorandum under the Engagement Agreement in favor of working exclusively with Globe. Notably, Sunrise received far greater commissions when it exclusively raised capital, as was the case with Globe, than if Sunrise facilitated third party offers under the Private Placement Memorandum and the Engagement Letter.

11.     Mr. Low and Mr. Kestenbaum have a long-standing relationship that goes back many years. On information and belief, Sunrise and Mr. Low raised some $300 million for Mr. Kestenbaum in order to found Globe. Mr. Low described Mr. Kestenbaum as one of his "best contacts" by email to me in January 2011. Mr. Low explained to IMG that Mr. Kestenbaum was very interested in investing with IMG. Further, Mr. Low convinced me that IMG should pursue a relationship with Globe in lieu of any other options and that Globe was the strongest possible partner.

12.     MST Financial, LLC ("MST"), a wholly owned subsidiary of Globe, presented IMG with a draft term sheet on November 29, 2010 to provide up to $3,000,000 in bridge financing for IMG's use as ordinary course working capital (the "Bridge Loan Term Sheet"). The Bridge Loan Term Sheet is attached hereto as Exhibit "C."

13.     Representatives of Globe and Sunrise attended a due diligence trip in Chile to evaluate IMG's ongoing projects there in December 2010, particularly focusing on IMG's rights

to extract iron ore from an extremely high grade lode located in 18,000 acres in the Atacama desert.  This Atacama investment is the most significant asset of IMG, and given the amount of time Globe, Sunrise, Low and Kestenbaum invested in examining the bona fides of this project, it is undoubtedly the primary target of their aggressive efforts to gain control of IMG. Over the period from December 2 to December 6, 2010, IMG hosted Steve Pragnell, a representative of Globe, Mr. Low from Sunrise and others in Chile.  On this initial due diligence trip, the terms of the loan contemplated by the Bridge Loan Term Sheet began to change, as Mr. Low told IMG about new offers from Mr. Kestenbaum and Globe, concerning a much more extensive equity investment by Globe that would ultimately result in Globe obtaining majority ownership of IMG. On the first due diligence trip, after receiving a term sheet for the bridge loan, I received offers through Mr. Low from Globe to make a direct $25,000,000 equity investment which would acquire 17% of IMG, and for options to acquire up to 51% of IMG's stock for $306,000,000, which anticipated a market value of $662,000,000 for IMG.  Mr. Low advised me to seriously consider Globe's offer.

14.    On that same trip, Mr. Low also informed me that Mr. Kestenbaum insisted that for Globe to make a $25,000,000 equity investment, IMG had to first close the bridge loan (the "Bridge Loan") with MST.  The Bridge Loan seemed unnecessary since Globe had promised that it was about to make a substantial equity investment in IMG.  I asked Mr. Low about this, but he insisted that Mr. Kestenbaum would not discuss further equity investments if IMG refused to close on the Bridge Loan.  Mr. Low also strongly discouraged me from discussing this issue directly with Mr. Kestenbaum.  I later discovered that, among other possible reasons for Mr. Low's encouragement to close on the Bridge Loan, Mr. Low received a 10% commission and

royalties for four years.

15.     Subsequently, on or about December 7, 2010, I met with Mr. Kestenbaum at Globe's offices in New York to discuss financing, and we negotiated the transaction.  At the time, we discussed that following closing of the Bridge Loan, Globe would provide $25,000,000 of equity financing, an $8.5 million trading credit line, and acquire related options for $306 million (in order to purchase 51% of IMG based on an implied valuation of the company of $662 million).  After the negotiation, Mr. Kestenbaum sent independent geologist Marcio Olivera from Brazil at a cost of $1,000 per day to verify and validate the excellent report he got from Steve Pragnell, Globe's in-house geologist, and Nathan Low regarding our Chile assets.  This same geologist later joined Mr. Kestenbaum, Mr. Low and me on a January 16th due diligence trip and confirmed again the potential of the assets.

16.     MST and Globe also unequivocally represented to IMG in term sheets and in their conversations with me that the purpose of the bridge financing was to provide IMG ordinary course working capital for its operations and acquisitions, as a prelude to Globe's equity investment.  Throughout this period, Mr. Low strongly encouraged me to sign the bridge financing on the strength of anticipated equity investment.  On December 6, 2010, for example, Mr. Low said:

> "Garrett you are about to be delivered $36.5mm AND a top mgmt team, and 200mm more.  This is your dream deal for a guy who borrowed plane tickets from his banker…Take a deep breath and say wow, I can't believe I am about to be worth $ 4 bn.  You deserve every penny."

The December 6 email from Mr. Low is attached hereto as Exhibit "D."

17.     In connection with negotiating the equity investment and trading credit line, I

6

prepared a capitalization table for Globe's approval in connection with negotiations over the Bridge Loan, and evidencing the parties' agreement to the material terms of the promised equity financing. On December 12, 2010 Mr. Kestenbaum participated in these negotiations and personally and expressly approved the capitalization table as "acceptable" stating:

> "We are looking forward to working <u>together</u> with you to leveraging all of our collective strengths and realizing the full potential of this opportunity."

See, Exhibit "E" (December 12, 2010 email chain among Messrs. Low, Kestenbaum, Krause and others). Mr. Kestenbaum also confirmed on December 12 that the negotiations concerning the capitalization table were complete.

18.     Mr. Low subsequently made specific representations to IMG about Mr. Kestenbaum's intention to close on the equity investment and majority ownership of IMG and referenced specific correspondence between the two to that effect. On December 15, 2010, Mr. Low sent me an email about Globe's plans to close an investment in IMG entitled "Alan is expecting to close tomorrow, he just told me." The December 15 email is attached hereto as Exhibit "F.". In the email chain I questioned whether a follow-on financing would really take place, to which Mr. Low confidently replied:

> Au contraire pierre…He [Mr. Kestenbaum] is absolutely committed to getting to 50.1%...He wrote me how excited he is about your vision, the opportunity, and working with you…He reiterated just now he plans to close tomorrow once ownership of these assets is properly recorded.

Exhibit "F" (Dec. 15, 2010 email chain between Nathan Low, Garrett Krause and others).

19.     Mr. Low also made statements to me during this period that Mr. Kestenbaum "owed" Mr. Low and therefore would close on the transaction without attempting to renegotiate its terms.

20. Through Mr. Kestenbaum's statements in connection with the capitalization table and Mr. Low's statements to me, including his affirmation (based on his correspondence with Kestenbaum) that Mr. Kestenbaum was "absolutely committed" to the equity financing, Sunrise and Globe induced IMG to enter into the supposed "bridge" loan to be used for IMG's ordinary working capital until the equity financing was completed. IMG was also induced by Sunrise and Low's false statement that the closing of the Bridge Loan was mandatory in order for Globe to complete any follow-on investment.

21. The contemplated investments were expressly linked to the closing of the Loan Agreement, in that IMG was required to sign two term sheets evidencing the investments as conditions precedent to the closing of the Bridge Loan, for (1) the $25 million equity financing including related options to purchase additional shares of IMG's common stock (the "Equity Financing") and (2) a trading credit facility of up to $8.5 million to be provided by companies to be established by Globe (the "Trading Facility"). The Equity Financing term sheet is attached hereto as Exhibit "G" and the Trading Facility term sheet is attached hereto as Exhibit "H".

22. The Equity Financing was also expressly referenced in the Bridge Loan as an Exempt Offering entered concurrent with the closing of the convertible bridge loan financing. A copy of the Loan Agreement dated December 20, 2010 is attached hereto as Exhibit "I." See. p. 3 ("Exempt Offering" defined to include "the sale by the Borrower of up to Twenty Five Million Dollars ($25,000,000) of Convertible Preferred Stock pursuant to the terms of the letter of intent being entered by the Borrower and the Agent concurrent with the Loan Closing.").

23. Mr. Kestenbaum would later contradict his representations and conduct in connection with the Bridge Loan, the Equity Financing and the capitalization table, by attempting

to fundamentally change the proposed equity deal structure. This bait and switch was not acceptable to IMG.

24. On information and belief, Kestenbaum, Low, Sunrise, Globe and MST all knew in December 2010 at the closing of the Loan Agreement that the purpose of the "Bridge Loan" was in fact to enable Globe's efforts to take over IMG's business operations, gain access to rights over its iron ore mining properties and confidential business information, to improperly funnel such information to related affiliates of Globe and Kestenbenbaum (such as Marco) and ultimately cause IMG to default.

25. Sunrise was also financially motivated to induce IMG to enter into the Loan Agreement. Sunrise stood to receive commissions, royalties and warrants were the deal to close between IMG and MST and to gain similar access to IMG's corporate opportunities and confidential business information.

26. In reality, the closing of the Loan Agreement was never a requirement for Globe to complete the financing and trading credit line as represented by Sunrise, contrary to Mr. Low's representations to me. On information and belief, at the time Sunrise induced IMG to close on the Loan Agreement, Globe and Kestenbaum were only interested in (i) gaining access to IMG's contacts and business partners for their own purposes or to improperly funnel that information to subsidiaries or affiliated entities, such as Marco, and (ii) using the "Bridge Loan" to take over IMG's operations.

27. Although the "bridge" loan is listed at an amount of $3,300,000, $300,000 allocated to the Class B Notes was phantom, deemed as compensation for Sunrise's work in arranging the transaction. Mr. Low personally became entitled to be owed $160,313 representing

53.44% of these notes at closing. See, Loan Agreement, Exhibit "I" Sched. B (Class B Lenders).

28. Of the remaining $3,000,000, IMG only actually received $2,615,235.95 for use as working capital at closing. $250,000 was set off directly by Globe to complete closing of acquisition of an asset in Chile (Cruz Grande S.A. Acquisition Capital), and to satisfy a previous debt of IMG (Repayment of Secured Loan (Wright Family Trust)). See Loan Agreement, Ex. "I" at Ex. I. Globe also set off $134,764 following the closing allegedly attributable to attorneys' fees and due diligence fees, which resulted in Globe. These extraordinary "due diligence" expenses related in large part to MST's hiring a team of attorneys in Chile to fully vet IMG's assets there. I acquiesced in this extraordinary set off because I believed that the due diligence anticipated the equity investment, namely the Equity Financing and Trading Facility. Such due diligence charges made no sense in the context of a $3.0 million bridge loan.

29. The anticipated use of proceeds for the Loan Agreement was for IMG's ordinary course working capital requirements including joint venture investment loans with junior miners in Mexico and acquisition payments on target opportunities in Chile. See Loan Agreement, Exhibit "I" at Ex. I (anticipated uses of proceeds). The parties also contemplated that IMG would use the loan proceeds to make deposits on long-term mining projects in development, such as the Los Choros project, and for machinery and equipment.

30. Sunrise, Globe, Kestenbaum and Low knew that anticipated use of the Bridge Loan proceeds would not begin to generate cash flow in time to repay a six (6) month working capital loan. Such an investment only made sense if linked to the promised Equity Financing and Trading Facility.

31. IMG also entered into a Security Agreement, a copy of which is annexed hereto as

Exhibit "J," whereby IMG pledged its assets to MST as collateral for the loan.

32.     The parties also signed the Royalty Agreement, a copy of which is annexed hereto as Exhibit "K," which provided ongoing royalties, for four years, to the lending syndicate related to IMG's mining operations (including Mr. Low, other Sunrise personnel and MST). The Royalty Agreement was expressly "a condition precedent to the Holders advancing the Loan to IMG pursuant to the Loan Agreement." Royalty Agreement, Exhibit "K" at p. 1. The Royalty Agreement further contained confidentiality provisions designed to protect IMG's business contacts and operations in connection with information provided under the Royalty Agreement.

33.     Mr. Low informed me shortly after the closing of the Bridge Loan (during approximately the last week of December) that Globe was ready to close the $25,000,000 Equity Financing, but that Mr. Kestenbaum would first need to travel to Chile to observe IMG's Chilean operations and assets himself. This began a several month dance in which Globe and Mr. Kestenbaum insisted upon ever more intrusive and expensive due diligence at IMG's expense, including multiple foreign trips, retaining geologists, and visiting with IMG's anticipated trading partners, particularly in China.

34.     Following the Bridge Loan closing, I went on trips in January and late March 2011 with Messrs. Kestenbaum and Low to Chile and China. On the trip to Chile, Mr. Kestenbaum brought a geologist, Marcio Oliverio, from Brazil.

35.     Globe and Mr. Kestenbaum during this time continually postponed closing on the planned equity investments, while demanding a steady stream of IMG's proprietary information. IMG continued to provide regular due diligence updates and expended money on trips with Globe personnel, and provided additional information to satisfy Globe/MST's requests and in

11

preparation for the equity investment. Such information included but is not limited to mineral discoveries, iron ore reserves, mining methods, plans and production schedules, terms of agreements, ownership interests, important trading relationships and other information relating to IMG's operations.

36.     Mr. Kestenbaum and Mr. Low then informed me that one more due diligence trip to China (to meet with IMG's management there and visit IMG's office, among other things) would be needed in March before the closing of Globe's Equity Financing. IMG arranged for this trip, although Messrs. Low and Kestenbaum traveled at their own expense. On this trip, Mr. Kestenbaum also brought a representative from his metals trading firm, Marco International Corporation ("Marco").

37.     Mr. Kestenbaum, Mr. Low, the Marco representative and I met in China with the Chairman and Vice President of Tianjin Bohai Steel Group ("Tianjin"), one of IMG's largest and most significant iron ore buyers and partners. Tianjin is one of the top ten steel producers in China, and is aggressively seeking iron ore supply throughout the world. Attached hereto as Exhibit "L" is correspondence from Mr. Gouren Li, Vice-President of Tianjin, relating that these meetings with Messrs. Kestenbaum and Low took place, and that they were apprised in those meetings about the significant value placed by Tianjin upon IMG's iron ore assets in Chile, primarily they were impressed with the high quality iron ore fines in Atacama.

38.     I believe that Globe planned around this time (if not before) to prosecute default under the Loan Agreement rather than complete the contemplated equity investment as a path to steal at pennies on the dollar the lucrative mining interests that IMG had been developing at great expense for years. I believe that the significant "due diligence" that was undertaken by Messrs.

12

Kestenbaum and Low on the premise of the intention to complete a significant equity investment was in fact a ruse to glean further proprietary information and to keep IMG and me from seeking alternatives while unaware of their intentions to prosecute the Collateral Sales upon maturity of the Bridge Loan.

  **B.**  **Globe, Sunrise, Marco, Kestenbaum, Low and MST Abused Their Access To Confidential and Proprietary Information, Using Such Access to <u>Frustrate Business Opportunities and to Stall the Equity Financing</u>**

  39.  I also believe that Mr. Kestenbaum's position as Chairman of Globe (MST's parent) caused MST to interfere with IMG's ability to operate its business and close transactions.

  40.  On information and belief, MST, Globe, Low and Kestenbaum disseminated the information they received among themselves and to third parties and affiliated entities (including Marco) for the purpose of unfairly competing with IMG's business operations and in an effort to frustrate IMG's plans to generate revenue with which to repay the Bridge Loan. There was no proper business purpose for the actions of Globe, Sunrise, MST, Marco, Kestenbaum and Low and such disseminations contravened the parties' confidentiality requirements.

  41.  As one example, I learned that after Mr. Low traveled at IMG's expense in support of the "due diligence" process to Chile, he appeared to use the information he learned to improperly deal with at least one of IMG's contacts, Mr. Santiago Lay, behind IMG's back. See Exhibit "M" (Jan. 29, 2011 email from Mr. Krause to Mr. Low). Mr. Low also tried to work with IMG contact Jorge Varela without IMG and to obtain projects from him, prior to Mr. Varela's employment with IMG. Sunrise only had access to Mr. Varela as a result of the due diligence that was being conducted in connection with Globe's supposed investment.

  42.  In May 2011, Sunrise promoted an entity called Iron Ore Acquisition Group that

had not been discussed with IMG. Upon information and belief, Sunrise's business venture relied in no small part on information received from IMG during "due diligence."

43. MST and Mr. Low thus explicitly breached the confidentiality provisions of the Royalty Agreement to IMG's detriment. The Royalty Agreement provides in part that:

> Information developed or acquired by the Holders (including the Agent) relating to mineral discoveries, ore reserves, mining methods, plans and production schedules, terms of agreements, ownership interests and all other information relating to IMG's operations ("**CONFIDENTIAL INFORMATION**"), shall be treated and kept as confidential and shall not be released or made public without IMG's express prior written consent…The Holders (including the Agent) acknowledge and agree that in the event of a breach of this covenant of confidentiality the remedy at law may be inadequate and, without limiting any other remedy available at law or equity, IMG may enforce this covenant through injunction, specific performance or other form of equitable relief or money damages or any combination thereof. (emphasis added).

44. In light of the fact that Globe never intended to complete the equity offering with IMG as originally proposed and negotiated, and (on information and belief) that Sunrise, Globe, MST, and Messrs. Low and Kestenbaum knew this, they in fact gained access to confidential information, including deal structures and deal terms, and corporate opportunities that IMG presented during due diligence for their own purposes in violation of the parties' agreements and understandings.

**C..** **Upon Closing, MST (at Kestenbaum's Direction) Almost Immediately Frustrates IMG's Performance Under the Loan Documents; The "Resguardo" and Other Transactions**

45. After the Bridge Loan closing, MST (at Kestenbaum's direction or under his control) requested that additional due diligence be completed prior to completing the planned equity offering with Globe. Nonetheless, IMG was repeatedly assured by MST/Globe employees

14

and Sunrise following the closing of the loan that the equity financing would soon be completed.

46. Instead, MST's requests and demands caused IMG to fail to close transactions and frustrated IMG's performance of its obligations under the Bridge Loan. The numerous requests for additional due diligence and delays in closing the equity offering also damaged and indeed prevented IMG's ability to perform its obligations under the Loan Agreement and Royalty Agreement. On information and belief, this was by design.

47. One such transaction, which IMG was on the verge of closing in February 2011, was the "Resguardo" transaction.

48. Resguardo was a transaction structured as a joint venture to acquire the assets of Associadad Minera Resguardo Limitada ("Resguardo") in Chile. Resguardo's assets included a mine that had completed test production and needed working capital to launch full production. The seller required an expedited closing, and IMG was able to structure the transaction, complete extensive due diligence, and prepare for closing within some 25 days. IMG sent the capital required at closing to Chile, where it was held in escrow pending closing.

49. On February 7, 2011, despite the substantial due diligence that IMG prepared, MST informed IMG by email that they would not consent to the Resguardo iron ore advance with option to complete 50% equity acquisition even though the prepayment advances for iron ore squarely represented an ordinary course working capital use contemplated in the Loan Agreement. A true and correct copy of that email is attached as Exhibit "N" hereto.

50. MST's citation to Section 7.4 of the Loan Agreement was nonsensical and unjustified as the Resguarado iron ore advance and subsequent equity investment was specifically contemplated in the Loan Agreement's use of funds provision. See, Loan

Agreement, Exhibit I.

51.     Mr. Kestenbaum met with Conrad Chase and further imposed additional unreasonable restrictions as a condition to consent.  These conditions were nowhere in Section 7.4 or anywhere else in the Loan Agreement.  I nonetheless pulled back the Resguarado deposit, honoring MST's rejection, because at that time I did not want to jeopardize the pending $25 million Equity Financing.  I believe now that MST's actions were taken in bad faith to deprive IMG of an investment that might generate cash flow in the near term, and thereby enable IMG's performance under the Loan Agreement.  Attached hereto as Exhibit "O" is a copy of the Affidavit of Conrad L. Chase filed in connection with the IMG State Court Case.  See ¶¶ 6-8.

52.     As a result of Globe's unreasonable demands, IMG was unable to close the acquisition of Resguardo.  Resguardo completed a transaction with another mining operation, and on information and belief is currently successfully producing 40,000 metric tons of processed iron ore materials per month.  This might have quickly been converted by IMG into millions of dollars of monthly cash flow and would have itself produced more than enough cash to repay the Bridge Loan within a short period of time.

53.     Second, MST took similar action with respect to a joint venture opportunity known as "Project Larry" in Mexico by imposing an unduly burdensome and unrealistic set of requests for further information.  This transaction also failed to close in or about February 2011 due to MST/Globe's actions.

54.     IMG also negotiated favorable transactions and signed Letters of Intent with the sellers of both the "Pool Balls" and Los Choros opportunities in Chile, but IMG was rendered unable to complete these transactions as a result of Globe's abrupt refusal to complete an

16

appropriate equity financing transaction as it had promised since December 2010.  In the aggregate, the pursuit of each of these significant transactions consumed significant time, and each rejection by MST led IMG to question whether MST had an ulterior motive.

> **D.** **Globe, Sunrise, MST, Marco, Kestenbaum and Low Attempt to Alter the Terms of the Anticipated Equity Financing**

55.    In April 2011, not long after returning home from the China trip and the meeting with Tianjin, Mr. Kestenbaum invited me to his office in New York to finalize Globe's equity investment in IMG.  Mr. Kestenbaum at that point revealed that Globe refused to invest in IMG on the terms of the Equity Financing (Exhibit "G"), but would instead invest only if IMG would transfer all of its assets into a new entity, a private Globe subsidiary, where Mr. Kestenbaum would make an equity investment of $25,000,000 and have immediate full control of the new entity.  Globe would retain a 51% share of the new entity for this $25,000,000, rather than the 17% originally offered, and leaving IMG with 49%.  Gone was the option for Globe to rise to 51% ownership only upon exercise of an option to purchase the remaining shares on a presumed valuation $306,000,000 for the 51%.  Mr. Kestenbaum even refused to forgive the Bridge Loan in this transaction, as he proposed leaving IMG responsible for repaying the $3,300,000 without access to equity financing or control of the assets.  After a month of discussions about the proposed JV and further delays in another required due diligence trip for Steve Pragnell and his geologists to come to Mexico, I cam to the conclusion that the materially altered terms were unacceptable to IMG, and I declined Mr. Kestenbaum's offer and beginning May 2, 2011 I started to look for other financing.

56.    At this time, I learned for the first time on or about May 2, 2011 that Globe had no

intention of completing any transaction with IMG on or before June 20, 2011, the maturity date of the Bridge Loan. This was not enough time for IMG to replace the Bridge Loan.

### E.  Globe, MST, Kestenbaum and Low Attempt Collateral Sales

57.     Realizing that IMG would be unable to repay the Bridge Loan in the period provided under the Loan Agreement, IMG notified MST and Kestenbaum on June 17, 2011 of IMG's need for an extension of time to repay or refinance (including proposed payment schedules and contracts), and requested forbearance in case of default. Globe, MST and Kestenbaum bluntly rebuffed IMG's request in a telephone conference on June 18, 2011 and pretended to not have any information regarding our overall business plan and further stated that he is just a lender and needed to protect his investment.

58.     On June 22 I also learned that Mr. Kestenbaum called my vice-president, Conrad Chase and appeared to offer him a job as he indicated that Globe would soon take over all of IMG's assets. Mr. Chase's recollections of this blatant attempt at interference with IMG's business are set forth in his Affidavit from IMG's New York State Supreme Court suit, Exhibit "O" hereto.

59.     MST then sent numerous default notices in June and July 2011 and scheduled collateral sales (the "Collateral Sales") seeking to sell the stock in IMG's subsidiaries holding the most valuable assets in Chile and Mexico.

60.     The notices of the Collateral Sales do not appear to have been made public. No or little advertising was undertaken, and even the individual note holders in the MST consortium were not apprised at first. This was certainly not a proposal for a "commercially reasonable sale," as would be required under the Uniform Commercial Code, but was a self-serving

maneuver to position Globe (or an affiliate) to buy IMG's assets at the Collateral Sales without meaningful notice to the public at pennies on the dollar.

61.     On July 11, I met with Mr. Kestenbaum and his counsel at Mr. Kestenbaum's office.  We agreed to postpone the first Collateral Sale until Tuesday, July 19.

62.     Following brief but unproductive settlement negotiations, both of the Collateral Sales were scheduled to proceed at the offices of MST and Globe on Tuesday, July 19.

63.     As a result of the scheduling of the Collateral Sales, IMG retained Seward & Kissel as litigation counsel.  On July 15, 2011 Seward & Kissel prepared and filed a Verified Complaint on behalf of IMG naming MST, Globe, Sunrise, Marco and Messrs. Kestenbaum and Low as defendants seeking, inter alia, an injunction against MST proceeding with the Collateral Sales and damages on behalf of IMG (the "IMG State Court Case").  On August 11, 2011, IMG filed a Verified First Amended Complaint in the IMG State Court Case, a copy of which is annexed hereto as Exhibit "P."

64.     As a result of the filing of the Verified Complaint, and the request for emergent relief presented simultaneously therewith, a hearing was held before the Honorable Justice Shirley Werner Kornreich on July 15, 2011 at which time IMG's request for preliminary restraints was granted, staying the sale scheduled for July 19, but predicating any further stay upon the posting of a bond in the full amount of the secured indebtedness.  A copy of the Order to Show Cause for Temporary Restraining Order and Preliminary Injunction entered on July 15, 2011 is attached hereto as Exhibit "Q."  Subsequently, however, Judge Kornreich held a preliminary hearing on July 27, 2011, entering an Interim Order, a copy of which is attached hereto as Exhibit "R" that conditioned the continuation of the preliminary restraints upon IMG's

posting a bond in the amount of $3.5 million.

65. IMG was unable to post a $3.5 million bond due to the fact that all our assets were still pledged and a bond would have required us to put up cash of $3.5 million, and the Collateral Sales were rescheduled for August 25, 2011. IMG had no recourse but to bankruptcy. On the Filing Date (August 24, 2011), IMG filed its petition for relief hereunder, effectively staying the Collateral Sales.

### F. The MST Counter-Suit

66. In response to the IMG State Court Case, MST initiated its own suit in the New York State Supreme Court on August 16, 2011 naming IMG as well as IMG's subsidiaries and affiliated entities as defendants (the "MST State Court Case"). A copy of the Verified Complaint initiating the MST State Court Case is attached hereto as Exhibit "P."

67. The MST State Court Case presupposes many of the arguments made in MST's motion herein in that MST attempts to construct arguments that IMG misused the proceeds of the Bridge Loan or made fraudulent conveyances with the proceeds of the Bridge Loan, particularly to or for the benefit of insiders of IMG. These allegations are categorically false, and I will address them separately below.

### G. The Allegations in the Motion for the Appointment of a Trustee

68. MST contends that the IMG bankruptcy was filed to (i) stop MST from conducting the Collateral Sales and (ii) to prevent MST from controlling or pursuing fraudulent conveyance claims against insiders of IMG. (Motion, ¶ 7). The bankruptcy was unquestionably initiated to prevent the Collateral Sales. The concept that IMG is shielding affiliated entities from liabilities for the recovery of fraudulent conveyances of the proceeds of the Bridge Loan

ludicrous and a mere litigation tactic. In each instance of alleged misuse of funds, I will demonstrate below that Globe, MST, Sunrise, Kestenbaum and Low had advanced knowledge of the intended use of funds, and that they encouraged such use or, at a minimum, acquiesced. Nowhere in the Motion does MST even acknowledge the extent of its foreknowledge of IMG's intended uses.

69.     In the period from December 2010 until at least April 2011, Sunrise, Globe, MST, Marco, Kestenbaum and Low placed a value of $25 million on a 17% equity interest in IMG. See Equity Financing, Exhibit "G." The Court is reminded that Sunrise, Globe, MST, Marco, Kestenbaum and Low had the benefit of months of poring over confidential due diligence information, and in the aggregate four (4) overseas trips to Chile and China, to evaluate the bona fides of IMG's business. Even the reconstituted offer delivered orally by Mr. Kestenbaum in April 2011, which I rejected on behalf of IMG, valued a 51% equity interest in IMG at $25 million. Given the value attributed to IMG's assets by Sunrise, Globe, MST, Marco, Kestenbaum and Low, and the fact that the bankruptcy petition of IMG reveals liabilities in total of $6,377,120.91 (Summary of Schedules, Docket No. 1), it is absurd to contend that a fraudulent conveyance is even a legal possibility. Instead, many of the contentions in MST's motion are mere innuendo, but I will respond as directly as possible to the issues raised therein.

**H.     Pre-Filing Date Defaults of the Loan Agreement Do Not Merit A Trustee**

70.     While the Loan Agreement states that IMG borrowed the sum of $3.3 million from the consortium of individual lenders represented by MST, Globe and Kestenbaum, IMG in fact received only $2,615,235.95 in proceeds following the closing, with the rest of the purported loan being either directly disbursed from closing, set off on account of fees, expenses or preferred

payments of Globe, or phantom consideration. As to the permitted uses of the proceeds of the Bridge Loan, paragraph 6.9 of the Loan Agreement (p 14) specifically provides as follows:

> 6.9    Use of Proceeds The Borrower shall use the proceeds of the Notes solely to finance the Borrower's working capital requirements as set forth on *Exhibit I*.

Exhibit I to the Loan Agreement, in turn, sets forth the following list of permissible expenditures:

| | |
|---|---|
| - Repayment of secured loan (Glenn Wright) | $ 100,000 |
| - Accounts Payable and General Working Capital | $ 250,000 |
| - Retainers (Legal and Accounting) | $ 50,000 |
| - Cruz Grande, S.A. Acquisition Capital | $ 150,000 |
| - Acquisition of Atacama New Sands | $ 250,000 |
| - Drilling and JORC Studies | $ 500,000 |
| - IMG Mexico JV Investment Loans | $ 500,000 |
| - Los Choros Acquisition Deposit | $ 500,000 |
| - Chispita Dorada Machinery & Equipment | $ 700,000 |

71.    IMG did in fact expend the actual Bridge Loan proceeds on expenditures that were substantially consistent with the directives of Schedule I. Over time, some of the capital requirements of these contemplated expenditures/investments changed and some of the intended investments did not happen at all. No variations from the specifications of Schedule I were in any way inconsistent with the business model of IMG that MST, Sunrise, Globe or Messrs. Low and Kestenbaum had exhaustively investigated before making the Bridge Loan. At the heart of Schedule I was that IMG could use the funds for working capital and investments. IMG did this.

72.    IMG acknowledges that it is in default under the Loan Agreement. This is primarily because the notes executed thereunder have matured. Beyond this, the pre-Filing Date "defaults" that MST identifies should be recognized for what they are - hyper-technical transgressions of a contract of adhesion presented to IMG and signed by IMG on the premise that the Bridge Loan was a predicate to an almost immediate roll-over into equity financing. Given

the evidence of MST's predatory lending tactics as well as the potential values of IMG's significant investments, into which Globe, Sunrise, Marco, Kestenbaum and Low have extraordinary insight due to the volume of due diligence trips and investigations they have undertaken, MST's stated grievances should only reinforce that Globe, Sunrise, Marco, Kestenbaum and Low are engaged in a high stakes theft under color of MST's premeditated Bridge Loan default.

73.     For example, the requirement that IMG retain BDO Seidman as an auditor to audit the Debtor's financials through December 31, 2010 (Trustee Motion, ¶ 13) was simply impossible to accomplish at the time of the Bridge Loan given the enormous expense involved and the six (6) month term of the notes under Loan Agreement, not to mention that the Schedule I budget would not have supported this expense.  Likewise, MST's reference to the Royalty Agreement pursuant to which MST was to receive royalty payments for iron ore shipments is meaningless.  MST's entitlement to royalties requires that IMG make such shipments.  No shipments have as yet been made, but the Court and MST are reminded that the term of the Bridge Loan was only six (6) months, and that only nine (9) months passed since the loan closed.

**I.      The Fact that the Debtor Engaged in Investments Through Foreign Subsidiaries Was Well Known to MST and the Existence of Other Corporate Affiliates and the Ownership Structure of the Debtor's Majority Shareholder (Javalon, S.A.) Should be Inconsequential**

74.     MST refers to "Krauses's web of related companies and insider transactions" (Trustee Motion, ¶ 18) in an effort to create an impression that IMG is not managed with appropriate respect to fiduciary obligations or observance of corporate separateness.  Nothing in this section is more than innuendo.  The Debtor is a publicly traded company.  It regularly files

its reports with the Securities and Exchange Commission.  See, Exhibit "A," 10Q for the Period Ending 6/30/2011.  In these filings the Debtor regularly reports its management and control structure to investors and to the SEC.  Nothing in this management structure has changed since the date of the Loan Agreement.  MST has had extensive insight into the management structure and personnel of IMG.  Included in these disclosures was the fact that eighty-one percent (81%) of the shares of IMG are held by Javalon, S.A. ("Javalon"), which is controlled by myself.  MST should not now be heard by this Court to be surprised at the fact of my control of management of both IMG and Javalon.   In fact, Javalon signed the letter of intent to option some of its stock to Globe as part of Globe/Sunrise/MST's desired path to gain control of fifty-one percent (51%) of the shares of IMG.  See, Letter of Intent, Exhibit "S."

75.     Most importantly, neither Javalon nor any entity controlled by Javalon or me received any funds from the proceeds of IMG's Bridge Loan nor did Javalon or I move any business opportunities from IMG to Javalon or any other entity outside of the control of or for the benefit of IMG.

76.     The Debtor has three (3) direct subsidiaries: (i) CIM Mineral Investors, S.A. ("CIM"), (ii) Hierro Mexico S.A. de C.V. ("Hierro") and (iii) IMG Iron Ore Trading S.A. ("Trading").  These entities each hold and are developing discrete mineral development rights of significant value.  MST has had extensive due diligence regarding IMG's planned investments therein, as well as the intention of IMG to down-stream proceeds from the Bridge Loan to these entities. These investments are consistent with the Debtor's business model, disclosed in the Debtor's SEC filings, and revealed in the due diligence conducted by IMG.  This due diligence includes the Private Placement Memorandum prepared in 2010 and reviewed by Globe, which

details IMG's intended investments.

**(i)      The OroGrande Transaction**

77.      OroGrande Iron Ore Company LLC ("OroGrande") is not a subsidiary of the Debtor.  It was, however, formed as a direct subsidiary of Javalon, S.A. as a special purpose company in order to preserve a business opportunity for the benefit of IMG.  OroGrande controls an iron ore delivery agreement with Gulf Coast Holdings, LLC ("Gulf Coast") for the acquisition and transportation of iron ore from a mine in OroGrande, New Mexico.  This agreement was offered to Javalon exclusively due to personal connections which I have.  Nonetheless, I structured the transaction so that the benefit of the iron ore supply agreement was assigned to IMG's subsidiary Trading and the benefit of this will flow to Trading and thus IMG.  Attached hereto as Exhibit "T" is correspondence dated September 27, 2011 from David Shaheen, the manager of Gulf Coast, indicating Gulf Coast's strict requirement in structuring the transaction (the "Shaheen Letter").  IMG directed $400,000 from the Bridge Loan into the OroGrande supply agreement to fund an advance payment for iron ore, which is consistent with the original business plan.  Iron ore shipments from this mine are scheduled to commence in October 2011.  OroGrande did not directly receive any of the $400,000 from IMG.  Gulf Coast, the counter-party to the iron ore supply agreement, was paid the $400,000 directly by IMG as part of a put option agreement.  At no time did I or any of IMG's affiliates other than Trading receive any benefit from the $400,000.  A copy of the Contract for Sale and Purchase of Iron Ore between OroGrande and Gulf Coast, as well as the assignment to Trading (collectively, the "OroGrande Put Agreement"), are attached hereto as Exhibit "U."

78.      MST cannot claim that the OroGrande investment was in any way outside the

scope of the Loan Agreement or in any way a surprise to MST. In June 2011, I personally had conversations with and exchanged e-mails with Michael Barenholtz of Marco and Mr. Kestenbaum concerning the capital required to fund the iron ore purchase agreement in OroGrande, and Mr. Kestenbaum indicated his intention, through Marco, to fund the agreement above and beyond the initial $400,000 remitted by IMG. A copy of this e-mail trail is attached hereto as Exhibit "V." IMG further disclosed the OroGrande transaction with Trading in an 8K filed with the SEC on May 11, 2011, a copy of which is attached hereto as Exhibit "W." As late as June 1, 2011, I received this encouragement from Mr. Barenholtz of Marco regarding OroGrande:

> I don't know why our discussion of today would signal a desire to no longer do business.
>
> That is certainly not the case.
>
> While we are disappointed with the decision to go with Trafigura in Manzanillo we by no means wish to discontinue what we have already begun and invested much time in.
>
> So yes, lets proceed with discussions on the Oro Grande Option.
>
> MB.

See, Barenholtz e-mail, Exhibit "W."

79.     IMG never heard from MST that it was in any way troubled by the OroGrande transaction or that it considered the OroGrande transaction a violation of any covenant in the Loan Agreement until after the maturity date and litigation ensued over the efforts of MST to conduct the Collateral Sales. I fully believe that Mr. Kestenbaum's failure to consummate his commitment to further fund the OroGrande transaction while at the same time seeming to tease

me with promises to negotiate funding was just another in the litany of broken promises to supply financing which amounted, in the aggregate, to a preconceived plan to deprive IMG of cash flow, interfere with IMG's business prospects and premeditate a default under the Loan Documents so that Globe could gain control of IMG's significant assets, including Trading's rights under the OroGrande iron ore supply agreement.

80.     The OroGrande opportunity was arguably outside the current business plan of IMG only because IMG originally intended to focus exclusively on Mexico and Chile iron ore opportunities through its subsidiaries.  OroGrande is a Florida limited liability company, is not directly a subsidiary of IMG, and the supply agreement concerns a mine supply in New Mexico. I nonetheless personally decided to enter into the OroGrande structure in order to bring added immediate cash flow and potential long-term value to IMG and at no time was it designed to be a side deal or move business opportunities away from IMG.  This is reflected in the 8K filed on May 11, 2011 and the fact that Trading stands to benefit tremendously from the put agreement and the potential follow-on assignment of a supply agreement for the remaining ore. Further, as the Shaheen Letter evidences, I made numerous attempts to get IMG engaged directly in the OroGrande deal, but was rebuffed by Gulf Coast, and Gulf Coast only assented to the deal as structured.  See Exhibit "T."

81.     I further had accumulated the benefit of some hindsight by the time I considered the OroGrande investment, as I realized that Mr. Kestenbaum had pretended to consider and then sabotaged the Resguarado, Project Larry, "Pool Balls" and Los Choros investments that had earlier been presented, and so I was on to Mr. Kestenbaum's game.  I knew that I needed to identify and bring cash flowing assets into IMG so that I could quickly meet the cash

requirements of servicing the Bridge Loan or some replacement financing. Nothing in the loan agreement says that I could not use the money for ordinary working capital and that means buying and selling iron ore which includes pre-payment advances.

### (ii)    The Minera BarraNava Joint Venture with Hierro

82.    MST has also called into question the relationship between Javalon and Minera BarraNava, S.A. de C.V. ("MBN"). Again, this story relates to a transaction which was entered into for the benefit of IMG, in order to develop a stream of revenue with which IMG could begin to satisfy the Bridge Loan. MBN was formed in March 2011 as a corporate vehicle and joint venture partner in Mexico for IMG's subsidiary Hierro in connection with certain transactions that were being presented to IMG in Mexico. MBN was intended to be the vehicle through which IMG's Mexican business associates/representatives, primarily Enrique Tachna and Alejandro Sandavol, could share in the profits of those investments with Hierro. I understand that this may seem abstruse to the Court, but I can assure the Court that conducting business in Mexico is not straightforward, and the committed assistance of our Mexican associates and partners was, in my opinion, critical to any success in Mexico, and sharing profits in this manner was essential to obtain that assistance.

83.    Hierro's joint venture with MBN has encountered significant problems, which we have not hidden from MST nor do we fail to disclose it to the Court. Hierro/MBN received $860,000 from the Bridge Loan from IMG. In a first transaction, Hierro/MBN investigated acquiring exclusive rights to explore for iron ore on the 4,800 hectare El Triangulo concession. Hierro/MBN expended significant resources to do exploration on the property, which included geology work with total business development expenses over the period of $150,000. It was

determined that even though there might have been iron ore to be found in the future, the $770,000 further cost for acquisition of the concession could not be completed and the project was abandoned.

84.     Subsequently, Heirro/MBN proposed a joint venture with International Business Corporation Jafid ("IBC Jafid") in which IBC Jafid was supposed to supply 300,000 metric tons of iron ore product to Heirro/MBN.  Heirro/MBN would trans-ship the product directly to Trafigura Baheer ("Trafigura"), a trading partner of IMG.  Trafigura is the world's third largest independent oil trader and the second largest independent trader in the non-ferrous concentrates market.  It has access to approximately US$30 billion in credit facilities, with investments in industrial assets around the world of more than US$2.5 billion with over $80 billion in 2010 revenues. See www.trafigura.com.  MBN and its partners were supposed to receive 50% of all profits on this contract for finding and sourcing the material and IMG was to receive 50% of all the profits on the contact for bringing financing and the buying Trafigura to the table.  The profit on the 300,000 metric ton transaction was projected to be $17,000,000.  I was the one that made the final decision to advance $600,000 from IMG to MBN for payment to IBC Jafid according to IBC Jafid's startup budget requirements to facilitate the startup of full production of Iron Ore from its properties.

85.     The transaction with IBC Jafid almost immediately encountered problems.  IBC Jafid failed to deliver the agreed iron ore and at this time Hierro and MBN have together taken steps to file criminal charges against the officers and directors of IBC Jafid in order to recover the money.

86.     After IBC Jafid defaulted, Javalon also took steps to take over and acquire MBN,

and the equity holders of MBN agreed to surrender their shares to Javalon in order to ensure that

MBN is able to fulfill its obligation to Hierro and complete the delivery of iron ore. At this time

MBN also acquired mining rights and options to four (4) other mining concessions. Since

Javalon's acquisition of MBN, MBN has delivered and repaid over $100,000 to Hierro and is in a

position pending one more mining permit to start delivery on the 300,000 metric ton contract set

for delivery to Trafigura for the benefit of IMG. This tale is not pleasant, but it represents an

accurate rendition of a set of circumstances in which an investment of IMG has gone poorly. I

am doing my best to preserve and recover IMG's investment and begin delivery on the initial

Trafigura contract and anticipate this to begin in the coming months.

87. MST's intimations that the investments in Hierro/MBN in any way represent a

corporate shell game to deprive IMG of a business opportunity is simply fiction. The facts are

quite the reverse, as every action taken in connection with Hierro/MBN was designed to generate

cash into IMG, and to facilitate payment to MST.

### (iii) The Monster Fuels Payments

88. In anticipation of the Bridge Loan and the Equity Financing, Mr. Kestenbaum and

Steven Leibowitz suggested to me that I consider moving IMG from a United States based

company to the Cayman Islands. Mr. Leibowitz, in particular, suggested this as IMG had no U.S.

based subsidiaries. To facilitate this move, in December 2010, at a point when I still believed

that the Equity Financing was in prospect, I moved all United States based employees of IMG to

a subcontracting entity, Monster Fuels, LLC, which does business as WV Associates ("Monster

Fuels"). In paying Monster Fuels, IMG essentially was paying its pre-existing employees,

officers, contract consultants, business development expenses and other public ongoing overhead

and costs of operating a fully reporting SEC public trading company.

89.     This payment represents the normal and necessary expenses for the operation of IMG.  It is disingenuous for MST to suggest that this payment is inappropriate or an abnormal insider transaction, particularly as it was representatives of MST who induced me into making this change in management structure.  In accordance with IMG's reporting obligations to investors and the Securities and Exchange Commission, we disclosed this management relationship as with Javalon, but the payment was in fact to Monster Fuels.  The Monster Fuels payment was also revealed in the answer to question 3 of the Statement of Financial Affairs concerning significant payments during the 90 day period prior to the Filing Date.  This expense is further anticipated in Section 6.9 of the Loan Agreement which authorized the use of the proceeds of the Bridge Loan for IMG's "working capital requirements."  Day-to-day management of IMG consists of 7 to 10 individuals doing international business development, management consultanting, accounting and audit assistance, banking and due diligence work and ongoing SEC filings including the new XBRL filing requirements for a public company such as IMG.  The existing management contract with Monster Fuels was within IMG's normal internal management costs based on 2009 and 2010 operations, and anticipated the exceptional costs associated with the due diligence being undertaken by Globe, Sunrise, MST, Kestenbaum and Low.  As of January 1, 2011 IMG anticipated paying these costs based on a $50,000 per month management contract, which was put in place and adopted by the board of directors of the company.   This exact expense and management structure was also set forth in IMG's 10Q Quarterly Report filed for the first quarter of 2011 (filed on April 15 for the period through March 31, 2011).  MST only refers the Court to the June 30 10Q.  The level of management

expense represented by the Monster Fuels payment was reasonable given IMG's development plans and expenses, particularly in light of the fact that Globe, Sunrise, Kestenbaum and Low were actively encouraging IMG to get out there and find deals so that IMG could adequately project the use of the anticipated $25 million Equity Investment.

90.     Again, MST is attempting to mislead the Court over a normal and necessary business practice of IMG. Most unfortunately, as with OroGrande and MBN, due to the steady stream of information turned over in good faith to Globe, Sunrise, MST, Kestenbaum and Low, MST knew full well what IMG was doing at all times. While the detail in MST's Motion reveals the depth of the knowledge MST has concerning IMG's operations and record keeping, the selective omissions of relevant information which MST also clearly had access to should at a minimum cause the Court to question MST's candor.

### J.     IMG's Present Plans and Reorganization Prospects

91.     I refer the Court to IMG's 10Q for the Quarter ending June 30, 2011, attached as Exhibit "A," Notes 2 through 5, pages 11 through 14, which contains a summary of the particular mining assets of Trading, Hierro and CIM, including the "Mineral Assets and Valuation." What is clear from this summary is that IMG, through its subsidiaries, controls significant development rights, particularly in the Atacama and Cruz Grande rights held in Chile, but that as yet no independent mineral valuation has been undertaken to establish a fair value to these assets and that there is no cash flow pro forma on which to extrapolate a value.

92.     Yet I can testify unequivocally that the aggressiveness of Globe, Sunrise, MST, Marco, Kestenbaum and Low stems directly from their detailed knowledge of the mining industry and their ability to anticipate the recognized but as yet unproven values of these projects.

Globe, Sunrise, MST, Marco, Kestenbaum and Low have a keen desire to control these development rights before a true value is imputed upon the completion and evaluation of detailed samplings as required by the standards of the mining industry.   The Court can take notice of the extraordinary value that the Equity Financing contemplated by Globe places upon IMG.  See, Exhibit "G."  Also, the opinion of IMG's Chinese trading partner, set forth in the correspondence of Mr. Gouren Li, Vice-President of Tianjin, relating that these meetings with Messrs. Kestenbaum and Low took place, and that they were apprised in those meetings about the significant value placed by Tianjin upon IMG's iron ore assets in Chile, primarily Atacama. Also, I attach hereto as Exhibit "X" a summary of drilling and geology reports of IMG's Atacama and Los Hornos projects in Chile prepared by Ing Fernancdo Cabrera, a geologist for IEPM, along with a resume of IEPM.  This report indicates Mr. Cabrera's conclusions from the reports that development of Atacama could result in profit of US $600,000,000.  Likewise, Mr. Cabrera indicates that the Los Hornos development rights may contain up to 100,000,000 metric tons of iron ore, though he does not estimate the profit to be realized from the development of this asset. Copies of the mining reports on which Mr. Vabrera bases his evaluations are attached hereto as Exhibits "Y" and "Z," respectively.

93.    But based upon these assets, I am also aware that IMG may be perceived by the Court as the epitome of the asset rich, cash poor debtor, and that such a combination may nonetheless render reorganization within a reasonable period of time difficult to envision.  For this reason, IMG has not placed all of its eggs in one basket, and the OroGrande Put Agreement and the MNB investments offer much more immediate prospects for generating a volume of cash flow that will sustain a reorganization plan.

### (i)      The Projected Cash Flow from the OroGrande Put Agreement

94.      The OroGrande Put Agreement particularly represents a real and imminent opportunity to generate significant cash flow within a short time frame. In OroGrande, IMG has the right to receive the benefit from the purchase and shipment of the first 180,000 metric tons of iron ore. This iron ore is extracted from the mine and ready for shipment, and IMG has exercised the put option and advanced $400,000 as a prepayment for the first 10,000 MT.. A last hurdle before moving the ore was recently resolved with the receipt of a permit from the Bureau of Land Management to cross its property with trucks thereby immediately clearing all obstacles and delays that we have experienced over the last 4 months.

95.      OroGrande is responsible to pay for the shipment and delivery to port of the ore. OroGrande had intended to look to IMG, and IMG to Globe, for this funding. In fact, the Trading Facility ($8.5 million, see ¶ 21 above) that Globe, Kestenbaum and Low promised to make available along with the Equity Financing was intended to facilitate just this sort of shorter term market opportunity that IMG had access to. I have been able to replace the expected funding from Globe with an agreement with Trafigura (see ¶ 82 above), which will finance the shipping requirements under the OroGrande Put Agreement, and assist with logistics. Attached hereto as Exhibit "S" is a copy of "Letter of Interest" dated September 27, 2011 from Juan Antonio Moran from Trafigura indicating Trafigura's intention to "purchase" the Oro Grande iron ore. (the "Trafigura Letter of Interest"). Using Trafigura as an alternative source of funds will nonetheless leave significant profit for IMG, which I now estimate to be $45 per metric ton shipped to market. IMG's profit on completion of this contract I thus estimate to be $8.1 million.

96.      I further anticipate that the time-frame for the pick-up, shipment and delivery to

port of the entire 180,000 metric tons contemplated in the OroGrande Put Agreement to be approximately six (6) months, but that cash flow to IMG from the first shipments may commence as soon as late October, 2011.

### (ii) The Trading-Trafigura Put Agreement

97.     Also due to my urgent hunt for cash flowing investments to address IMG's Bridge Loan, in June 2011, Trading signed a 300,000 metric ton FOB Iron Ore Sales Contract with Trafigura contemplating deliveries from iron ore supply guaranteed under Trading's existing agreements in Manzanillo Mexico (the Trading-Trafigura Put Agreement"). This agreement is referenced in the Trafigura Letter of Interest. Trading is resolving its final outstanding issues before the commencement of deliveries under this agreement, but anticipates commencing deliveries in November 2011. Trading has already encountered and overcome significant delays in effectuating this agreement related to an extended rainy season, permitting delays, and the suspension of iron ore processing at all Manzanillo port patios by an environmental regulatory agency.

98.     Based upon present iron ore market rates, I anticipate that Trading will receive profit of approximately $10.5 million from the completion of the Trafigura-Trading Put Agreement, which profit will be fully realized prior to June 30, 2012.

### (iii) Further Equity/Institutional Financing

99.     I have not neglected to search for an appropriate equity or institutional investor for IMG, but the bankruptcy filing now makes that prospect unlikely, at least as the means of reorganizing IMG. I am instead now investigating the availability of a $25 million bond offering into Javalon as well as other opportunities to bring alternate financing opportunities into Javalon.

Javalon has retained Aegis Capital Corp. in New York, Richardson GMP in Canada and Seymour Pierce in London to assist it with placing this bond offering. A representative of Aegis will attend the hearing on the Motion herein.

100. If successful, this bond offering will enable the satisfaction of the entire amount of the Bridge Loan indebtedness in full.

**(iv)**     **When Will the Reorganization Path be Clarified?**

101. I will know considerably more about the progress of the OroGrande Put Agreement and the Trading-Trafigura Put Agreement by November 30. If these agreements proceed as profitably as currently projected, I anticipate that IMG will be in a position to file a plan of reorganization and disclosure statement in December 2011 that will contemplate paying the Bridge Loan in full over a short period of time from IMG's profits in these agreements.

102. I also anticipate that I will know if the Javalon bond issuance is well received by November 30, 2011, and that such an issuance may close and fund as early as the end of the year. Such an eventuality would also permit the filing of a plan of reorganization in December 2011, or perhaps even a dismissal motion that contemplates immediate full satisfaction of all Senior Notes.

**K.**     **The Court Should Deny the Relief Requested**

103. MST first seeks the appointment of an "independent fiduciary" to serve as chapter 11 trustee or, in the alternative, appointment of a chapter 7 trustee. I ask the Court to deny this relief. The Debtor presently has no cash on hand or cash flow and MST knows this. The only prospect for any cash flow in the near future rides on the successful effectuation of the OroGrande Put Agreement and the Trading-Trafigura Put Agreement. With due respect to the

capacities of any "fiduciary" the court may interpose, it is my efforts and the efforts of IMG's present management that are essential to obtaining the profit from the fulfillment of these agreements.

104.     IMG further disputes the predicates of MST's claim for the need for a fiduciary. MST parlayed the Bridge Loan into carte blanche access to IMG's businesses, management and organization.  It now uses that intricate knowledge as a sword, attempting to deliver a quick death blow to a debtor that is cash poor.  I ask that the Court recognize that IMG is cash poor at present only because of the manipulations of Globe, Sunrise, MST, Marco, Kestenbaum and Low.  IMG initiated the IMG State Court suit to address these issues, and is contemplating removal of that case into this Court.  IMG was lead down a primrose path, but it has woken up and is moving as quickly as possible to identify all avenues of revenue that will displace the Bridge Loan.  The prospects are good, but IMG will need time.  This is the very purpose of reorganization.

105.     To date, IMG has been a model debtor. On the Filing Date, IMG filed complete Schedules and Statements of Financial Affairs with the Court, with no deadlines set by the Clerk due to omissions or amendments required.  I have already met with the bankruptcy analyst designated with the Office of the United States Trustee, and attended the Section 341 Meeting of Creditors.  IMG has supplied all documents requested by the analyst and the United States Trustee.  IMG opened its Debtor-in-Possession bank accounts, and is otherwise fully aware of and complying with the Operating Guidelines of the United States Trustee.  I fully understand these reporting obligations, and intend to make sure that IMG abides these requirements in a timely manner.

106.     I also understand MST's contention that it possesses a security interest in any cash that IMG might generate.  I am aware of the requirement that IMG obtain the approval of the Court to expend cash collateral, and upon the inception of revenue IMG will immediately present a request to MST and an application to this Court for permission to do so.  In the meantime, I am also cognizant that the Court has cautioned that IMG's management expense is not to be paid before the presentation and approval of such an application.

107.     At the same time, I ask the Court to discount the instances of alleged mismanagement or insider dealing identified by MST.  In each area delved into by MST, the reality is different from the impression MST has attempted to create.  The OroGrande Put Agreement in particular is not a dubious insider transaction but the most imminent cash-flow opportunity available to IMG.  Further, the entire structure of IMG's affiliated entities, from the subsidiaries Hierro, Trading and CIM, to Javalon and me, are committed to satisfying MST and preserving the value of IMG's assets.

108.     MST also seeks relief from the automatic stay so that it may proceed with the Collateral Sales.  On behalf of IMG, I contend that this relief is unwarranted.  Permitting the Collateral Sales to proceed would effectively extinguish IMG's control of its subsidiaries Hierro, CIM and Trading, and these subsidiaries hold all of the iron ore mining rights that represent IMG's assets.

109.     Against this backdrop, I ask that the Court weigh the nearly overwhelming evidence of the bad faith of Globe, Sunrise, Marco, Kestenbaum and Low.  With significant assets but <u>no</u> cash flow, IMG was induced by these parties to enter into a bridge loan with a six (6) month maturity.  IMG did not even need the loan.  The loan only made sense in the context in which it was presented, as a prelude to the Equity Financing which, at $25 million, and accompanied by access to the $8.5 million trading line, represented adequate capital to enable IMG to effectuate the business plan contemplated in the Private Placement Memorandum. Globe, Sunrise, Marco, Kestenbaum and Low required the Bridge Loan in bad faith and misused the anticipation of the Equity Financing to embark upon a series of due diligence junkets, at IMG's expense, primarily poring over the Chilean assets and level of interest of the Chinese ore purchasers, while at the same time frustrating or directly interfering with any nearer term cash flow opportunities.  The Court must not let this group capitalize on a strategy that wreaks so horrendously of bad faith.


                                       _____/s/ Garrett K. Krause_____
                                       GARRETT K. KRAUSE

Sworn to before me this
28th day of September, 2011


_____/s/_____
     Notary Public